**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DWAYNE BALLINGER, JR.,

      Petitioner,

                                   CASE NO. 2:09-CV-13886

v.                                  HONORABLE ARTHUR J. TARNOW

JOHN PRELESNIK,

      Respondent.

_____/

## OPINION AND ORDER CONDITIONALLY GRANTING PETITION FOR WRIT OF HABEAS CORPUS

      Petitioner, Dwayne Ballinger, Jr.,  filed this action under 28 U.S.C. § 2254.  He was convicted after a jury trial in the Wayne Circuit Court of first-degree murder, MICH. COMP. LAWS 750.316, and felony-firearm.  MICH. COMP. LAWS 750.227b.  The state trial court sentenced Petitioner to life imprisonment with no possibility of parole.  Petitioner claims in his habeas application that his trial attorney provided ineffective assistance of counsel when he failed to call an alibi witness at trial.  He also claims that several errors occurred involving the admission of an assault rifle as a trial exhibit.  Because counsel was ineffective for failure to investigate and call a known alibi witness, the petition will be granted.

## I. Factual Background

      Petitioner's case arises out of a late-night shooting on a residential street in Detroit. Two young men, Mario Harris and Darius Jones, were shot to death.  Two friends of victims

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

witnessed the shooting.  They identified Petitioner by his street name, Mellow, as the shooter.  No other evidence tied Petitioner to the crime.

## A. Trial

At Petitioner's jury trial, Ramon Nixon testified that he was 17 years old.  On July 4, 2006, at about 1 :30 a.m., Nixon was with Derrick Greene, Mario Harris and Darius Jones on Fielding Street in Detroit.  As they were talking, a green car pulled up.  A person who Nixon only knew as "Mellow" got out of the passenger side of the car.  Nixon was familiar with Mellow's face from the neighborhood.  He identified Petitioner at trial as being the man who got out of the green car.

Petitioner walked over and started arguing with Jones.  Nixon heard Petitioner say to Jones, "You better not bring your bitch ass back across Kentfield or it's on."  The two continued to argue for about 10 to 15 minutes.  During this time, Nixon just stood-by and watched the argument, as did Harris, who was standing in front of Nixon's car.  Greene was talking on his phone while sitting in Jones's car across the street.

Petitioner then walked back to the passenger side of the green car and pulled a gun out of the car.  Nixon identified a prosecution exhibit, an AK-47, as the same type of gun that Petitioner returned with from the car.  But he did not know if it was the exact same weapon.

Petitioner and Jones started arguing again. Then Petitioner started shooting.  Nixon ran as soon as he heard shots.  When he returned, Nixon saw Jones and Harris on the ground.  Petitioner and the green car were gone.

2

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

On cross-examination, Nixon acknowledged that he was not at the scene when the police arrived. He had gone to Sinai Grace Hospital, where he received a call from his brother informing him that the police wanted to speak with him. His brother then put a police officer on the phone. The officer asked him if he had been involved in a shooting. Nixon denied that he had been present. The officer told him to come to Fielding Street where his car was still parked and riddled with bullet holes. Nixon later made a written statement for the police in which he claimed that he was inside Jones's house when the shooting occurred. After an officer confirmed with members of Jones's family that Nixon was not inside the house, he changed his story again and told the police that he had witnessed the shooting. Nixon identified Petitioner, Mellow, as the shooter.

The next day, Nixon went to the prosecutor's office and made another statement. He told a prosecutor that he knew Mellow from having seen him around, and that Mellow was "supposed to be the weed man over there." People in the neighborhood knew Petitioner's name, but Nixon only knew him by his nick-name.

Derrick Greene testified that he knew Mario Harris, Darius Jones, and Ramon Nixon. Greene testified that in the early morning hours of July 4, 2006, he drove Jones's car to Fielding Street. When he got there, he sat in the car and was talking on the phone. He was parked across the street from Nixon's car. While he was sitting in the car, a green car pulled up. He had seen this car before in the neighborhood, and associated it with Mellow's people. Greene identified Petitioner as the person he knew as Mellow. He did not know Petitioner by any other name.

3

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

When the green car pulled up in front of the car that he was in, he could see two people in the car.  A tall guy got out on the driver's side of the car, and a shorter guy got out of the passenger side. The two men walked up to Jones and started talking to him.

Greene saw a little handgun in the hand of the man who got out of the driver's side of the green car.  The conversation between Petitioner and Jones lasted about three or four minutes.  Then Petitioner walked back to his car, went to the passenger side, and grabbed an "SK", which Greene described as a semiautomatic rifle.  He identified the prosecution exhibit as "like the same gun.  It don't look like that, no."  Tr. II, at 73.

Petitioner walked back with the gun.  After he and Jones exchanged a few more words, Petitioner turned around as if he were going to walk back to the car.  Petitioner then turned around again, lifted the gun up, and started shooting.  When the shooting started, he saw Harris fall and then Greene ducked down in Jones's car.  Greene heard 10 or 15 shots.  When the shooting stopped, he lifted his head up and saw the Aurora pulling off.

On cross-examination, Greene acknowledged that he did not name Mellow as the shooter in his statement to police, nor did he indicate that he knew the shooter from the neighborhood. He acknowledged that the only description he gave of the shooter was that there was a tall guy and a short guy. Greene also failed to tell the police that the green car was usually driven by Mellow's people.

Detroit Police Officer Gregory Matthews testified that he was on duty on July 4, 2006. He and his partner were called to an address on Fielding regarding a shooting. He observed two victims lying near a vehicle. They appeared to have gunshot wounds. He also observed casings around the vehicle.  While there, Matthews talked to with Derrick Greene.

4

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

Matthews's report did not indicate that Greene gave him any names or street names for the suspects.

Detroit Police Evidence Technician William Niarhos testified that he responded to the scene on Fielding Street.  He collected numerous shell casings, some bullet fragments, a fired bullet, and one gym shoe.  A Monte Carlo parked at the scene had a shattered window on one side of the car and a bullet hole in the other window. All of the casings were fired from an assault rifle.

The parties stipulated to the identification of the victims and that they died of multiple gunshot wounds.

Petitioner called one witness in his defense.  Nicole Garrett testified that she had known Petitioner for seven or eight years.  During that time, she had known Petitioner to go by the street name of "Rain."  She never heard anybody call him Mellow.

The jury found Petitioner guilty of first-degree murder and felony-firearm.

### B. State Post-Conviction Review

Prior to sentencing, Petitioner retained his present counsel.  He filed a motion for new trial claiming that his trial attorney provided ineffective assistance of counsel for failing to present an alibi defense. The motion noted that prior to trial, counsel had filed a notice of alibi that named "Marie Krisel" as an alibi witness. The prosecutor had objected because the notice had been filed one-day late, so defense counsel withdrew it and had stated that no alibi defense would be presented.  The motion for new trial was supported by the affidavit of Marie Cunningham.  Cunningham stated in her affidavit that she was with Petitioner from 9:30 p.m. on July 3, 2006, to 3:00 a.m. on July 4, 2006, at a house on

5

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

Vaughn Street in Detroit.  This covered the time of the shooting.  Cunningham also stated in the affidavit that defense counsel never spoke with her.

At the sentencing hearing, Petitioner's counsel stated that the name Marie Krisel listed on the alibi notice is the same person as Marie Cunningham.  The trial court summarily denied the motion without oral argument, refusing the request for a hearing.

Petitioner was then appointed a different attorney to represent him during his direct appeal.  Appellate counsel timely filed a motion to remand in the Michigan Court of Appeals that was supported by Cunningham's affidavit, asserting that trial counsel was ineffective for failing to investigate and raise an alibi defense and call Cunningham. The state appellate court summarily denied the motion for "failure to persuade the Court of the need to remand at this time."

When the appellate court issued its decision on the merits, it limited review of Petitioner's ineffective assistance of counsel claim to the existing record because the motion to remand had been denied.  The state court then relied on the fact that the existing record did not support Petitioner's claim and rejected it with the following reasoning:

> On appeal, defendant argues that his trial counsel's failure to investigate and call Cunningham to testify as an alibi witness deprived him of a substantial defense. But, "counsel cannot be found ineffective for failing to pursue information that his client neglected to tell him." *People v. McGhee,*268 Mich. App. 600, 626; 709 N.W.2d 595 (2005). Although defendant's trial counsel listed Krisel as a potential witness in the alibi notice, there is no evidence in the record supporting the assertion that Krisel and Cunningham are the same person.  That said, there is no evidence that trial counsel was aware of Cunningham as a potential witness or the substance of her purported testimony before trial. Moreover, defendant has not established that Cunningham's testimony would have affected the outcome of the case. *Henry, supra* at 146; *Hyland, supra* at 710. Two eyewitnesses, Greene and Nixon, unequivocally identified defendant as the shooter at trial.

6

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

Accordingly, defendant has failed to overcome the presumption of effective assistance of counsel. *Henry*, *supra* at 146.

*People v. Ballinger*, 2008 Mich. App. LEXIS 731, 3-6 (Mich. Ct. App. Apr. 10, 2008).

The Michigan Supreme Court denied leave to appeal by standard order, *People v.Ballinger*, 482 Mich. 975, 754 N.W.2d 896 (2008).  Petitioner then filed the instant petition.

## C.  Federal Court Evidentiary Hearing

An evidentiary hearing was held in this Court on Petitioner's ineffective-assistance-of-counsel claim.

Petitioner's trial counsel, Kerry Jackson, testified that he had been licensed to practice law in Michigan from 1988 to 2008.  In 2008 his license was suspended because he "ripped up a bunch of grievances and threw them in the garbage and refused to deal with them."  Hrg. Tr. at 6.  He testified, though, that his suspension and ultimately the revocation of his law licence had nothing to do with his representation of Petitioner. Petitioner and his girlfriend had filed grievances against Jackson, but he testified that they were thrown-out by the Grievance Commission.

Jackson explained that a staff attorney at the commission was out to get him. Ultimately he decided to stop practicing law.  The initial suspension occurred after Jackson filed a response to a complaint one day late.  A default was subsequently entered against him, and his license was suspended.  Having decided to stop practicing law, Jackson failed to appear at a subsequent hearing and his license was revoked.

7

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

Jackson testified that he no longer possessed any materials relating to Petitioner's case. He recalled the case, however, and remembered that after speaking with Petitioner his strategy was to work out a plea deal for second-degree murder.

Jackson was hired by Petitioner's family. Jackson testified that Petitioner's mother had Petitioner hidden in an apartment in Detroit because she was scared that he would be killed by friends of the victims. Jackson testified that one of Petitioner's friends had already been shot in retaliation. Jackson first met with Petitioner at the apartment, and he recounted what Petitioner told him:

> Dwayne Ballinger had gone to speak to several young men about whether or not they were allowed to come across Six Mile. He explained to them that coming across Six Mile was his territory and he did not want them in that area.
>
> As he turned to walk away, one of the young men - I don't really whether it's on of those who died, or you know, as luck might have it, it would probably be the one who lived. The one of the young men mouthed off to him and said we'll come over there any damned time we want to.
>
> Dwayne then went to the green car and retrieved the AK-47. And - even though I had heard this phrase before, I had never heard anybody tell it to me - he decided to, in his words, "holla at them with the gun." When I asked him what did that mean, that is when he admitted that he shot them.

Hrg. Tr. at 27.

After hearing this account, Jackson decided to attempt to negotiate a plea bargain and avoid trial. Petitioner agreed with this approach, but the best offer Jackson could negotiate was for an unacceptable thirty-year minimum sentence. Jackson was informed that one of the victims was the son of a secretary at the prosecutor's office and that it would be difficult to obtain a favorable plea deal.

8

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

Forced to go to trial, Jackson's strategy was to argue that there was no real evidence that Petitioner was at the scene of the crime. Jackson recalled that the eyewitnesses did not know the perpetrator's true identity, and a defense witness would testify that Petitioner was not known by the street-name the witnesses used to identify Petitioner. Counsel also recalled that there was no physical evidence connecting Petitioner to the crime.

Jackson testified that he obtained the names for the alibi list either from Petitioner, his mother, or from the mother of his children. Those were the three people he had talked to about Petitioner's case. He recognized Petitioner's mother sitting in the courtroom at the hearing but did not recognize the other woman.

Jackson acknowledged that he filed the alibi notice nine days before trial, but that the court rule required it to be filed ten days prior to trial. He explained, however, that he did not intend to actually raise an alibi defense: "It was never my intent to argue alibi from the day that I originally met Dwayne Ballinger and what he told me happened." Hrg. Tr. at 17. He filed the notice only to keep the option of calling the witnesses open: "There was a chance that there could have been four or five witnesses who were going to show up who would have told me something, and then they would have said, you know, Dwayne lied to you, he didn't kill those people, he was with me." Hrg. Tr. at 30. He acknowledged that he may also have filed the alibi notice to mislead the prosecutor as the nature of the defense, or in order to secure a more favorable plea offer.

Finally, Jackson testified that he spoke to a woman at her home in Inkster - a friend of Petitioner's child's mother - about being an alibi witness, but that woman said she was

9

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

unwilling to lie on the stand.  Counsel did not recall meeting a woman who lived on Vaughn Street in Detroit about being an alibi witness.

Michelle Krisel testified that her maiden name was Michelle Cunningham.  She was not the woman Jackson spoke with in Inkster.  Krisel testified that she and Petitioner had an intimate relationship in July of 2006.  She spoke with Jackson by telephone prior to trial, and she informed him that she was willing to testify in Petitioner's defense.  She told Jackson that she was with Petitioner at the time of the shooting and planned to meet with Jackson in person at his mother's house, but Jackson never showed up for the meeting.

At the time of the shooting Krisel was four or five months pregnant and she had not seen Petitioner for a couple of months.  She saw him on July 3, 2006, at Petitioner's sister's house on Fielding Street.  When she was at this house helping Petitioner's sister prepare food for the Fourth of July, Petitioner came by.  Krisel started "cussing him out" but ended up spending the rest of the night with him at his house on Vaughn Street.  Petitioner always maintained his innocence with her.

Petitioner elected not to testify at the hearing.

## II. Standard of Review

In the order granting Petitioner an evidentiary hearing, this Court found that the Michigan Court of Appeals unreasonably applied clearly established Supreme Court law when it rejected Petitioner's ineffective assistance of counsel claim.  Accordingly, for the reasons stated in that order and reiterated below, Petitioner has overcome the barrier to review of this claim imposed by 28 U.S.C. §2254(d).  Review of the claim is therefore *de novo.*  See *Cullen v. Pinholster*, 131 S.Ct. 1388, 1412-1413, 179 L. Ed. 2d 557 (2011) (J.

10

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

Breyer, concurring) ("[I]f the state-court rejection assumed the habeas petitioner's facts (deciding that, even if those facts were true, federal law was not violated), then (after finding the state court wrong on a (d) ground) an (e) hearing might be needed to determine whether the facts alleged were indeed true"); *Brown v. Smith*, 551 F.3d 424, 429 (6th Cir. 2008).

With respect to Petitioner's other claim, 28 U.S.C. § 2254(d) bars habeas relief for claims adjudicated on the merits in state court unless the state court adjudication runs contrary to clearly established Supreme Court law, or if it results from an unreasonable application of that law or an unreasonable determination of the facts.      A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application occurs" when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.  A federal-habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 410-11.

11

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

### III. Discussion

#### A.  Ineffective Assistance of Counsel

Petitioner claims that his trial attorney provided ineffective assistance of counsel when he failed to present Krisel as an alibi witness at trial.  The state appellate court unreasonably applied established Supreme Court law when deciding this claim. Essentially, the state court denied the claim on the merits despite the fact that the record was insufficient to reasonably decide the claim one way or the other.  This Court held a hearing on the claim, and the record is now complete.  The Court finds that the Petitioner has demonstrated that his trial attorney provided ineffective assistance of counsel.

#### 1. Entitlement to Hearing in District Court

The Michigan Courts recognized that Petitioner had a Sixth Amendment right to the effective assistance of counsel at trial, but they unreasonably decided the claim that it was denied when they did not provide Petitioner an opportunity to fairly present the claim.  In many cases, the standard for adjudicating ineffective-assistance-of-counsel claims requires a reviewing court to determine the reasons for counsel's actions or omissions.  If those actions or omissions are determined to be professionally deficient, then the reviewing court also has to weigh the effect they had on the outcome of the trial.  Because many of the things a criminal defense attorney does or fails to do occur outside of the courtroom, by their nature, many claims of ineffective assistance are based on facts not apparent on the trial court record.  In such cases, a hearing is often required to reasonably adjudicate the claim.  Michigan recognizes this.  *People v Ginther*, 390 Mich. 436 (1973).

12

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

Petitioner claimed in the state court that his trial attorney was ineffective for failing to call an alibi witness. The state court record showed that his trial attorney was at one point at least alert to the possibility of presenting such a defense, as he filed a notice of alibi. It also showed that he abruptly abandoned the defense when the prosecutor objected to the untimeliness of the notice. Petitioner proffered evidence to the state courts after his conviction that the defense would have been substantial and that trial counsel knew about it.  The affidavit of the alibi witness indicated that she was with Petitioner at the time of the shooting. Petitioner's appellate counsel represented that the person listed on the notice of alibi was the same person who signed the affidavit.  The affidavit also stated that defense counsel never spoke with the alibi witness, suggesting that Petitioner gave counsel the name of a potential witness, but that he failed to investigate the defense.

What was not known in the state courts is why Petitioner's attorney abandoned the defense and whether that action had an effect on the outcome of Petitioner's trial.  It may have been that defense counsel had a good reason not to present the defense, but it may also have been the case that the action was the result of deficient performance.  Similarly, the alibi defense might have been strong or it might have been weak.  But based on the scant record before the state court, it was impossible for it to determine the answers to these questions.

The state appellate court effectively passed these questions on to this Court. It concluded that Petitioner's claim was meritless without providing Petitioner with any opportunity to develop a record to support his claim.

13

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

Rule 8 of the Rules Governing § 2254 Proceedings sets forth the procedure a district court must employ when determining whether to conduct an evidentiary hearing. Under Rule 8, "the judge must review the answer, any transcripts and records of state-court proceedings, and any [other] materials . . . to determine whether an evidentiary hearing is warranted."  The decision whether to conduct an evidentiary hearing under Rule 8 falls within the Court's discretion. *Alley v. Bell*, 307 F.3d 380, 389 (6th Cir. 2002).  In deciding whether to grant the hearing the Court must consider whether the grounds Petitioner alleges are sufficient to secure his release from custody and relevant facts are in dispute. *See Washington v. Renico*, 455 F.3d 722, 731 (6th Cir. 2006).

Petitioner raised a substantial, potentially meritorious, ineffective-assistance-of - counsel claim in his habeas petition. Petitioner's defense at trial was mistaken identification, and his counsel supported the argument through the cross-examination of the prosecution witnesses.  If believed, a witness testifying that she was with Petitioner at the time of the shooting at another location would have been consistent with, and supported, this defense. It appears that defense counsel at least knew about this witness because he filed a notice of alibi that named her. And as stated above, there is no indication in the record why defense counsel withdrew the alibi notice.  Based on the state court record alone, it was impossible to determine whether trial counsel's conduct was the result of reasonable trial strategy  or deficient performance or whether there is a reasonable probability that the result of the trial would have been different had the alibi witness been called to testify. Because Petitioner's claims, if established factually, may have been sufficient to demonstrate that he was denied his Sixth Amendment right to the effective assistance of

14

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

counsel during his trial, and therefore demonstrate entitlement to habeas relief under 28 U.S.C. § 2254(a), the Court found that the interests of justice warranted an evidentiary hearing on the issue.

28 U.S.C. §2254(d) did not bar a hearing on Petitioner's claim.  In *Cullen v. Pinholster*, U.S. , 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011), the Supreme Court held that habeas review under § 2254(d) is "limited to the record that was before the state court."   Applying § 2254(d) review here, the Court concluded that the state court unreasonably applied clearly established law in denying Petitioner's claim.

The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), is clearly established federal law for purposes of 28 U.S.C. § 2254(d). Cullen, 131 S. Ct. at 1403 (2011).   Under the familiar *Strickland* standard, an attorney is constitutionally ineffective if "counsel's performance was deficient" and "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687.   The state appellate court unreasonably applied this standard because based on the record available at that time it was impossible for it to reasonably adjudicate Petitioner's claim.

To establish deficient performance under *Strickland*, a defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*  In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance.   "Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.   "In any ineffectiveness case, a particular

15

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

decision to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000).

Based on the scant record before the state appellate court, there was no way for it to reasonably decide the issue of deficient performance. In a similar case, the Sixth Circuit determined that deciding an ineffective assistance of counsel claim without a hearing when the record was not sufficiently developed did not even count as an "adjudication on the merits" as contemplated by § 2254(d), let alone a reasonable one. *See Brown v. Smith*, 551 F.3d 424, 429-430 (6th Cir. 2008) ("We conclude that the absence of the [factual development] before the Michigan Court of Appeals (through no fault of Brown's), combined with that court's explicit statement that its review was 'limited to mistakes apparent on the record,' means that there is no relevant state court adjudication to which this court can defer.")

Here, the record only showed the state court that Petitioner's counsel was aware of the factual basis for an alibi defense and that he later withdrew it. It was not known whether he did so based on legitimate strategic reasons or as a result of deficient performance. The state appellate court's finding that there was no evidence in the record supporting the assertion that Krisel and Cunningham are the same person," and that "there is no evidence that trial counsel was aware of Cunningham as a potential witness or the substance of her purported testimony before trial," was unreasonable. There was no

16

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

evidence of these assertions solely because the state court denied Petitioner's request for an evidentiary hearing.

Appellate counsel proffered that the person listed on the alibi notice was the same one who signed the affidavit, but he was denied any opportunity to make a record of that fact.

The state appellate court also unreasonably applied the prejudice prong. To satisfy this prong of the *Strickland* standard, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.*, at 694.  The *Strickland* Court elaborated on how the prejudice inquiry must be conducted:

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.*, at 695-696.

The Michigan Court of Appeals concluded that Petitioner could not demonstrate prejudice because two eyewitnesses identified him as the perpetrator of the shooting.  But that fact alone is insufficient to reasonably support the state court's conclusion that Petitioner could not demonstrate prejudice.  The state appellate court could not have

17

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

reasonably weighed the error against the totality of the evidence, as *Strickland* required it

to, because it had no way to judge the strength of a defense that was never presented at

a hearing.  *Strickland* required the state court to "tak[e] due account of the effect of the

errors," but in this case it could not have reasonably weighed the effect an un-called

witness without hearing her testimony. On the face of things, the affidavit presented a

complete alibi defense. Perhaps the credibility of the alibi witness would have belied the

credibility of the identifying eyewitnesses. Perhaps not.  But there was no rational basis for

the state court to conclude that Petitioner did not demonstrate prejudice without hearing

from her.

Respondent objected to this reading of *Cullen*, essentially maintaining that  any

merits analysis of a habeas petitioner's substantive claims must be funneled through

§2254(d). But  §2254(d) is worded in the negative.  It states that habeas relief may not be

granted unless the state court adjudication is contrary to Supreme Court law or results from

an unreasonable application of facts or law.  *Desai v. Booker*, 538 F.3d 424, 428-429 (6th

Cir. 2008) ("the provision in effect raises additional hurdles to a habeas claim–additional

reasons in the words of the statute why the writ "shall not be granted.")  It is designed as

a bar to habeas relief that states "a necessary, but not a sufficient, condition for habeas

relief." J*ackson v. McKee*, 525 F.3d 430, 438 (6th Cir. 2008).

Section 2254(a), on the other hand, is the section that governs the standard for

granting habeas relief.  It states that habeas relief may only be granted where a state

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

prisoner is held in custody in violation of his constitutional rights. *See Desai*, 538 F.3d at 427-428.[1]

*Pinholster* concerns the application of §2254(d) and not §2254(a). It held that a habeas court may not consider new evidence in determining under §2254(d) whether a state court decision was unreasonable. It does not hold that a habeas court may not consider new evidence in determining whether a petitioner is being held in custody in violation of his constitutional rights under §2254(a). None of the cases cited by Respondent in its motion to reconsider the Court's order granting an evidentiary hearing involve a situation, as here, where the Court determined that §2254(d)'s hurdle had been cleared but a hearing was still required to determine whether, in fact, Petitioner's constitutional rights had been violated.

This is exactly the point made by Justice Breyer in his concurring opinion in *Pinholster. Id.*, 131 S.Ct. at 1412. Respondent says that Justice Breyer's opinion was not the opinion of the Court. That is true. But Justice Breyer's opinion is in no way inconsistent with the majority opinion. The problem in *Pinholster* was that the federal habeas court held a hearing to determine whether the state court decision was reasonable under §2254(d). As the *Pinholster* Court held, the analysis under §2254(d) requires the habeas court to

---

[1]

Most times a finding in favor of the Petitioner under §2254(d) means that *a fortiori* Petitioner is held in violation of his constitutional rights under §2254(a). It is usually the case that where a state court unreasonably rejects a constitutional claim it can also be immediately determined that the constitutional right was violated. But this is not always true. Here, the state court unreasonably decided Petitioner's claim precisely because it did not have enough evidence before it to fairly adjudicate it one way or the other.

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

perform the analysis in light of the evidence available to the state court at the time.  The situation here is different.  This Court has determined–based on record before the state court–that the Michigan Court adjudication of Petitioner's ineffective assistance of counsel claim was unreasonable, and that §2254(d) does not bar review of Petitioner's claim.

The hearing ordered by the Court was not held to determine whether the state court's adjudication was reasonable–the type of hearing barred by *Pinholster*–but to determine under §2254(a) whether Petitioner is being held in custody in violation of his constitutional rights.  In other words, having determined that the state court unreasonably decided Petitioner's claim, the Court was not in a position to grant or deny relief because absent a hearing it was not known whether Petitioner's claim was meritorious.

### 2. Merits of the Claim

As stated above, to establish the ineffective assistance of counsel, Petitioner must first show that his "counsel's performance was deficient." *Strickland*, 466 U.S. at 687 (1984).  This requires a showing that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688.  Second, Petitioner must show prejudice by establishing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  An attorney may be found to have rendered ineffective assistance of counsel if he fails to investigate and raise a viable alibi defense, and presentation of that defense would, with reasonable probability, have resulted in a different outcome.  *See, e.g. Bigelow v. Haviland*, 576 F.3d 284, 289 (6th Cir. 2009).

20

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

In *Nix v. Whiteside*, 475 U.S. 157, 166 (1986), the Supreme Court held, however, that an attorney's duty to advocate a criminal defendant's cause is limited to legitimate, lawful conduct. "Although counsel must take all reasonable lawful means to attain the objectives of the client, counsel is precluded from taking steps or in any way assisting the client in presenting false evidence or otherwise violating the law." *Id.* An attorney who refuses to present false testimony does not render deficient performance, 475 U.S. at 168-169, and the failure of the jury to hear the false testimony does not result in prejudice because it does not undermine confidence in the result of the trial. 475 U.S. at 175-176. *See also Northrop v. Trippett,* 265 F.3d 372, 385 (6th Cir. 2001) (Though a defendant's false testimony might have persuaded the jury to acquit him, it is not fundamentally unfair to conclude that he was not prejudiced by counsel's interference with his intended perjury).

The resolution of Petitioner's claim hinges on the credibility of his trial attorney's testimony at the evidentiary hearing. If his testimony at the hearing is to be believed, then Petitioner confessed the crime to him, and counsel was ethically prohibited from presenting an alibi witness's testimony that he knew to be false. If Jackson was not telling the truth, and Petitioner never confessed to him, then his failure to investigate and present an alibi defense must have been the result of deficient performance.

The Court finds that attorney Jackson's testimony was not credible.

First, Jackson admitted that his licence to practice law had been revoked. His troubles with the bar first started when he filed a response to a grievance one-day late. Then the problems escalated when he started to simply throw requests to answer grievances in the trash. This conduct reveals a contemptuous attitude and Jackson's

21

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

willingness to abandon professional responsibilities. Rather than face his troubles, Jackson sought to avoid them. And that is what happened in Petitioner's case as well. Jackson filed the notice of alibi one day late. But rather than attempt to persuade the trial court to accept the late filing, he abruptly abandoned Petitioner's defense. Again at the hearing in this Court, rather than face the allegation of ineffective assistance, Jackson chose to deflect the claim by claiming that he did not present an alibi defense because his client had confessed the crime to him.

The Court finds Jackson's story to lack credibility. If, as he claims, Jackson felt ethically prohibited from presenting an alibi defense, then one would think he would have also felt ethically prohibited from filing the notice of alibi defense at all. See Michigan Rule of Professional Conduct 3.1 ("A lawyer shall not . . . assert . . . an issue . . . unless there is a basis for doing so that is not frivolous"). Yet the trial court record shows that he filed a notice of alibi despite his testimony that Petitioner confessed to him. If Jackson were truly concerned about his ethical obligations, then he would not have filed the notice of alibi at all. The Court therefore finds that Jackson's claim that he did not pursue an alibi defense because of ethical constraints is belied by the record. His testimony that Petitioner confessed to him is not credible. Because Jackson did not offer a credible reason why he failed to present an alibi defense, the Court finds that he did so out of professional neglect, and thereby rendered deficient performance.

Counsel's purported concern for the ethical problem he faced is diminished by his subsequent indifference towards his ethical obligations when he ignored State Bar requests for information concerning other possible ethical violations. Michigan Rules of Professional

22

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

Conduct 8.1(a)(2). The Court finds that counsel's testimony that he refused to present an alibi witness because he felt ethically prohibited from doing so is not credible in light of his obvious lack of care towards his other ethical obligations. To put it plainly, the Court does not believe that Petitioner confessed his guilt to Jackson. The Court finds that Jackson fabricated the confession in an effort to excuse his deficient failure to present a known alibi witness.

Furthermore, as the Supreme Court stated in *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (quoting 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.)), "the duty of the lawyer to conduct a prompt investigation" exists regardless of "the accused's admissions or statements to the lawyer of facts constituting guilt." Even if it were true that Petitioner confessed his guilt to Jackson, it does not excuse his failure to investigate the possibility that Petitioner lied to him. Indeed, Jackson admitted that one of the reasons he might have filed the late notice was in case enough alibi witnesses came forward and convinced him that Petitioner lied to him. Such a possibility was foreclosed by Jackson's failure to conduct any reasonable investigation into raising the alibi defense, including meeting with Krisel as planned.

The Court therefore finds that Jackson rendered deficient performance when he failed to fully investigate the possibility of raising an alibi defense, failed to file a timely notice of alibi, and failed to call Krisel as a defense witness at trial. As in *Bigelow v. Haviland*, 576 F.3d at 289, in a case in which everything turned on the alibi defense - and in which the prosecution's ability to place Petitioner at the scene of the crime rested entirely on the testimony of eyewitnesses who were friends of the victims and did not know the true

23

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

identity of the perpetrator - Jackson had ample reasons to do more than he did with the one alibi witness who came forward. "With every effort to view the facts as a defense lawyer would have done at the time, it is difficult to see how [Jackson] could have failed to realize that" without interviewing Krisel, he was "seriously compromis[ing] [his] opportunity to" present an alibi defense. *Id.* citing *Rompilla*, 545 U.S. at 385.

Moreover, the Court has little trouble finding that Petitioner was prejudiced. The prosecution's case against Petitioner was far from overwhelming. The only evidence it had connecting Petitioner to the crime was the testimony of the two eyewitnesses. Both of these young men were friends of the victim, but they had nevertheless initially failed to disclose that they could identify the perpetrator to the police. Moreover, although they ultimately identified Petitioner as the perpetrator, there was conflicting evidence whether his street name was actually Mellow.

On the other hand, Krisel's proffered alibi testimony was credible. She testified that she spent the evening of July 3rd through the night of July 4th with Petitioner. She testified that she recalled the date of the meeting because she was several months pregnant - presumably with Petitioner's child - and she was angry with Petitioner because she had not seen him for a few months. She recalled the date because she ran into Petitioner at his sister's house while she was helping prepare food for the upcoming holiday. She also testified that Petitioner had always maintained his innocense with her. If Krisel's testimony were to be believed, and Respondent did nothing to impeach her credibility, it would have provided a complete defense to the charges.

24

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

As the Sixth Circuit stated in *Ramonez v. Berghuis*, 490 F.3d 482, 491 (6th Cir. 2007):

> Even though the jury could have discredited the potential witnesses here based on factors such as bias and inconsistencies in their respective stories, there certainly remained a reasonable probability that the jury would not have. Ramonez's case was therefore prejudiced where their testimony would have helped corroborate his testimony and contradict that of complaining witness Fox (see *Workman v. Tate*, 957 F.2d 1339, 1346 (6th Cir. 1992)), but where counsel's default in carrying out his constitutional obligations resulted in that testimony not being introduced at trial. All it would have taken is for "one juror [to] have struck a different balance" between the competing stories (*Wiggins*, 529 U.S. at 537).

The Court finds that there is a reasonable probability that the result of Petitioner's trial would have been more favorable to him had his counsel presented the alibi defense. *English v. Romanowski*, 602 F.3d 714, 730 (6th Cir. 2010) (Attorney's failure to investigate possibility of calling defense witness resulted in prejudice in part because there was a lack of overwhelming evidence of guilt). Accordingly, the Court will grant Petitioner habeas relief with respect to his first claim.

### B.  Prosecutorial Misconduct

Petitioner claims that the prosecutor committed misconduct by his use of the AK-47 during the trial without any evidence attesting to the similarity of the weapon with the one used during the crime. He also claims that the prosecutor committed misconduct during closing argument by suggesting that the AK-47 was the actual weapon used during the crime. Lastly, he claims that the trial court erred by failing to rule on Petitioner's objection to the admission of the AK-47. These claims do not have merit.

25

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

To prevail on a claim of prosecutorial misconduct, a petitioner must show that the alleged misconduct infected his trial with such unfairness as to make the resulting conviction a denial of due process. *Byrd v. Collins*, 209 F. 3d at 529 (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986))(quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  Courts must keep in mind that "the touchstone of due process analysis in cases of alleged prosecutorial misconduct  is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillip*s, 455 U.S. 209, 219 (1982).  "Therefore, even if the prosecutor's conduct was 'undesirable or even universally condemned,' *Darden*, 477 U.S. at 181 (quotation marks and citations omitted), it does not constitute a due process violation unless the conduct was 'so egregious so as to render the entire trial fundamentally unfair.'" *Byrd*, 209 F. 3d at 529 (end citations omitted).  Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006)(quoting *Donnelly*, 416 U.S. at 645).  If a prosecutor's statements were neither individually nor collectively prejudicial to Petitioner, then a state court decision rejecting the claim is reasonable and survives §2254(d) review.   *Batey v. Scutt*, 2012 U.S. App. LEXIS 2710 (6th Cir. 2012).  Finally, in deciding whether prosecutorial misconduct mandates that habeas relief be granted, a federal court must apply the harmless error standard. *See Pritchett v. Pitcher*, 117 F. 3d 959, 964 (6th Cir. 1997).

Petitioner first claims that the prosecutor committed misconduct by using an AK-47 during trial without first establishing that it was substantially similar to the one used in the

26

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

crime. The Michigan Court of Appeals found as a matter of state law that the AK-47 was properly admitted as demonstrative evidence. *Ballinger*, 2008 Mich. App. LEXIS 731 at *8- 10. A prosecutor does not commit misconduct by using evidence that was properly admitted pursuant to state law. *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008); *see also Mitchell v. Renico*, 2005 U.S. Dist. LEXIS 25376 (W.D. Mich. Oct. 19, 2005) (prosecutor's use of SKS assault rifle as demonstrative evidence as allowed by state law comprehends no federal constitutional right).

Petitioner also asserts that the prosecutor committed misconduct when it suggested that the AK-47 was the actual weapon used in the crime. During closing argument the prosecutor stated: "when you apply the simple facts to the law that's given by the Judge, there will be no doubt in your mind that he should be found guilty of murder in the first degree for the two deaths, and felony firearm because he was using *that* gun." T 12-14-06, at 5 (emphasis added).

Petitioner reads this quote out of context. The prosecutor argued that the two eyewitnesses testified that Petitioner was armed with an AK-47 and shot the victims. At some points he referred to the weapon as "an AK-47" or "the AK-47", and at other points he referred to it as "that AK-47." He also referred to the argument Petitioner had with the victims as "that fight." The record does not indicate that the prosecutor was pointing to or referring to the demonstrative exhibit when he made these statements. Indeed, if he had it likely would have drawn a vigorous objection. Defense counsel pointed-out in his closing argument that the eyewitnesses testified that the exhibit looked like the weapon that Petitioner used, but it was not the actual one. The officer-in-charge conceded during cross

27

*Ballinger v. Prelesnik,* U.S.D.C. No. 2:09-CV-13886

examination that he knew of no connection between the exhibit and Petitioner.  Therefore, the use of the term "that AK-47" was not improper and did not render Petitioner's trial unfair.

Lastly, Petitioner asserts that his right to due process was violated because the trial court never explicitly ruled on his objection to AK-47.  Given the fact that the Michigan Court of Appeals found as a matter of state law that the weapon was admissible as demonstrative evidence, Petitioner has not shown that the trial court's failure to make an explicit ruling during trial had a substantial influence on the outcome of the trial.  *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

Accordingly, Petitioner's claims concerning the AK-47 are without merit.

### IV. Conclusion

For the foregoing reasons, **IT IS ORDERED** that the petition for a writ of habeas corpus is **CONDITIONALLY GRANTED.**

Unless a date for a new trial is scheduled within 90 days, Petitioner must be unconditionally released.

**SO ORDERED.**

S/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Judge

Dated: February 23, 2012

I hereby certify that a copy of the foregoing document was served upon parties/counsel of record on February 23, 2012, by electronic and/or ordinary mail.

S/Catherine A. Pickles
Judicial Assistant

28